UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| MICHAEL HUBBARD, | ) | |
|---|---|---|
| *Plaintiff*, | ) | Case No. 2:19-cv-234 |
| | ) | |
| v. | ) | Judge Travis R. McDonough |
| | ) | |
| | ) | Magistrate Judge Cynthia R. Wyrick |
| EVOLUTION WIRELESS, INC., et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## MEMORANDUM OPINION

Before the Court is Defendants Evolution Wireless, Inc. ("Evolution Wireless"), James Watts, and Metro PCS Communications, Inc.'s ("Metro PCS")[1] partial motion to dismiss Plaintiff Michael Hubbard's claims against them in his amended complaint (Doc. 27). For the following reasons, the Court will **GRANT IN PART, DENY IN PART,** and **RESERVE RULING IN PART** on Defendants' motion.

### I.  BACKGROUND

Michael Hubbard is a bisexual, African-American man who worked as a district manager of cellular phone and accessory stores in Evolution Wireless's North Eastern Tennessee territory from approximately May 2017 to about June 2, 2018. (Doc. 22, at 3–4; Doc. 22-1, at 2.) James Watts was Hubbard's direct supervisor. (Doc. 22, at 3.) Hubbard alleges that Chastity Hueser, an account manager for Metro PCS, recruited him for the position of district manager and that

---

[1] MetroPCS Communications, Inc., represents that it is now known as T-Mobile US, Inc., as a result of a 2013 merger. (Doc. 27.) Throughout this memorandum and order, the Court will continue to refer to this defendant as named in the amended complaint. (*See* Doc. 22.)

Evolution Wireless "is in association with or a partner of or other agent of" Metro PCS. (*Id.* at 3–4.) Hubbard alleges that Defendants discriminated against him on the basis of his sex and sexual orientation, and retaliated against him for attempting to file a claim with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* at 3; Doc. 22-1.)

Hubbard complains that, "throughout his employment" with Evolution Wireless, he was subjected to "ongoing discriminatory harassment for being the only male district manager" of the four district managers, all supervised by Watts, "in the Southern Market of Evolution Wireless." (Doc. 22, at 3–4.) He alleges that he was treated differently than the other district managers and that "all" previous male district managers were either terminated or resigned due to the hostile work environment. (*Id.* at 4.) For Hubbard, this hostile work environment and discriminatory treatment involved harassment, name-calling, "unwanted touching," and assault. (*Id.* at 3.) For example, on one occasion, a female employee "grabbed" his genitals. (*Id.* at 4.)

Hubbard alleges that the hostile work environment was "fueled" by sexual relationships between Watts and Hubbard's female supervisees, which motivated the female employees to work "at the pleasure of" Watts rather than being directed by Hubbard. (*Id.*) Hubbard also alleges that Watts gave "additional compensation" and "perks" to those female employees. (*Id.*)

In August of 2017, Hubbard asked Watts to "discontinue his personal relationships with the staff and to allow [him] to make district managerial decisions in the markets based on skill" rather than on Watts's "personal relationships with the managers and other district managers." (*Id.*) Watts allegedly responded by accusing Hubbard of "being 'in his business,'" calling him a "faggot," and stating, "[I]f you scratch my back, I'll scratch yours." (*Id.*) Hubbard then tried to involve James Jackson, the owner and CEO of Evolution Wireless, who is also Watts's son, but Jackson did not return his call. (*Id.*) When Watts discovered that Hubbard had "attempted to go

2

over his head," he threatened to fire him if he did so again. (*Id.*) Watts also "warned" Hubbard that he "was required to hire and fire as [Watts] instructed." (*Id.*)

Early in January of 2018, Hubbard and another male employee attempted to file a charge of race and sex discrimination and retaliation with the EEOC but later learned "it had not been accepted electronically." (*Id.* at 3, 5.) Sometime before attempting to file the charge with the EEOC, Hubbard reported Watts's use of the slur "faggot" to Hueser, the Metro PCS account manager who had recruited him. (Doc. 22, at 4–5.) Around this time, Hubbard was offered the Knoxville Territory "due to his superior sales record." (*Id.* at 4.) Acquiring the Knoxville Territory would add another five stores to the six stores he was already supervising. (*Id.*) Although Hubbard hesitated for some time about whether to accept the Knoxville Territory, he eventually accepted it on or about January 29, 2018. (*Id.* at 4.)

Also in or around January of 2018, one of Hubbard's female supervisees reported to him that she was "uncomfortable" because Watts was "having nude pictures of himself circulating to many employees electronically" and they had also been sent to her. (*Id.* at 5.) Hubbard alleges that, per company policy, he began an investigation, but Watts found out and "engaged the assistance of . . . female employees to manufacture reasons to fire the complaining employee." (*Id.*) Watts also "encouraged and allowed the two female employees to verbally threaten" the complaining employee if she continued to report the situation. (*Id.*) When Hubbard refused to fire her, the two female employees claimed she had stolen money from their purses. (*Id.*) The complaining employee notified Hubbard of these threats and requested to speak with Jackson, the owner. (*Id.*) After she spoke with Jackson, Watts instructed Hubbard to fire her. (*Id.*) When Hubbard objected to firing her without a reason, Watts threatened to fire Hubbard as well if he did not follow through with firing her. (*Id.*)

3

On or about March 4, 2018, Watts took the Knoxville Territory from Hubbard and gave it to a "much lessor [sic] qualified female employee," allegedly as a result of his refusal to fire the complaining employee. (*Id.* at 5.) Later, on or about April 18, 2018, Watts again called Hubbard a "faggot" because he objected to Watts's instructions for him to fire an employee who had done "nothing wrong" and promote one of two unqualified female employees, rather than "better qualified male candidates" to be Hubbard's assistant. (*Id.* at 6.) After calling Hubbard a "faggot," Watts also allegedly said, "I don't tell you not to do what you guys do," and "I am not telling you where to stick your thing so don't tell me where to stick mine." (*Id.*)

Then, on or about June 2, 2018, Watts fired Hubbard, citing that the company had lost "faith in his abilities to run his territory." (*Id.* at 3.) Hubbard asserts, however, that he was fired because he refused to participate in the "hostile work environment" and because of his attempted EEOC charge. (*Id.*) He successfully filed a charge of discrimination with the EEOC on or about June 27, 2018. (*Id.*)

Hubbard filed his original complaint in the Circuit Court of Sullivan County, Tennessee, on November 25, 2019. (Doc. 1-2.) On December 31, 2019, Evolution Wireless and Watts, with the written consent of Metro PCS, removed the action to this Court. (Doc. 1.) Hubbard filed an amended complaint on February 10, 2020. (Doc. 22.) Although the causes of action are not listed clearly, the amended complaint appears to assert the following claims against all three defendants: (1) discrimination on the basis of sex and/or sexual orientation and retaliation, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*; (2) retaliatory discharge under the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304; (3) retaliatory discharge under Tennessee common law; (4) discrimination in violation of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101; (5) negligent or intentional infliction of emotional

4

distress; (6) defamation; (7) negligent hiring and supervision; and (8) intentional interference with contract expectancy.² (*Id.* at 7–10.) Defendants have filed a motion to dismiss most of Hubbard's claims against them (Doc. 27),³ and that motion is now ripe for the Court's review.

## II. STANDARD OF REVIEW

According to Rule 8 of the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though the statement need not contain detailed factual allegations, it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

A defendant may obtain dismissal of a claim that fails to satisfy Rule 8 by filing a motion pursuant to Rule 12(b)(6). On a Rule 12(b)(6) motion, the Court considers not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct." *Id*. at 679. For purposes of this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the veracity of all well-pleaded factual allegations in the complaint. *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859

---

² There are several mentions of race discrimination in the amended complaint (*see* Doc. 22, a 1, 3), and Hubbard alleged race discrimination in his EEOC charge (*id.* at 5). However, he does not assert a claim for race discrimination in the section of his amended complaint identifying his causes of action. (*See id.* at 7–10.) Additionally, Plaintiff's affidavit, which is attached to his complaint, claims discrimination on the basis of his sex and sexual orientation, but not his race. (*See* Doc. 22-1, at 2.) Other than the statement that Plaintiff is African American, no additional factual allegations relating to race discrimination are included in the complaint. (*See generally* Doc. 22.) For these reasons, the Court construes Hubbard's complaint as not asserting a claim for race discrimination.

³ Defendants have not moved to dismiss Hubbard's Title VII claims of sex-based discrimination and retaliatory discharge against Metro PCS and Evolution Wireless.

(6th Cir. 2007). This assumption of veracity, however, does not extend to bare assertions of legal conclusions, *Iqbal*, 556 U.S. at 679, nor is the Court "bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

After sorting the factual allegations from the legal conclusions, the Court next considers whether the factual allegations, if true, would support a claim entitling the plaintiff to relief. *Thurman*, 484 F.3d at 859. This factual matter must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III. ANALYSIS

Defendants move to dismiss all claims except Hubbard's Title VII claims of sex-based discrimination and retaliation against Metro PCS and Evolution Wireless. (*See* Doc. 27.) First, Defendants move to dismiss Hubbard's Title VII claims against Watts, asserting that Title VII does not provide for individual liability. Second, Defendants move to dismiss Hubbard's Title VII claim for sexual-orientation discrimination, arguing that Title VII does not prohibit discrimination on the basis of sexual orientation. Third, Defendants move to dismiss the following claims as barred by the applicable statutes of limitation: retaliatory discharge under the TPPA and/or Tennessee common law; discrimination in violation of the THRA; negligent or intentional infliction of emotional distress; defamation; and negligent hiring and supervision.

Fourth and finally, Defendants move to dismiss Hubbard's claims of intentional interference with contract expectancy for failure to state a claim upon which relief can be granted.

      **A.     Title VII Claims Against Watts**

Defendants move to dismiss Hubbard's Title VII claims against Watts, asserting that the Sixth Circuit does not recognize liability for individual employees under Title VII. (Doc. 27, at 2–3.) Hubbard responds that "facts are alleged to show that Mr. Watts acted recklessly and intentionally," but provides no further argument and cites no law to support his argument that Watts can be held individually liable under Title VII. (Doc. 31, at 2.)

Title VII provides that "it shall be an unlawful employment practice for an employer" to discriminate on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). A person aggrieved by such discrimination may bring a civil action against the "employer." *Id.* § 2000e–5(b). "Employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such person." *Id.* § 2000e(b). The United States Court of Appeals for the Sixth Circuit has held that, despite the inclusion of "any agent" within the statutory definition of "employer," "Title VII does not create individual liability for individuals in supervisory positions" who do not otherwise qualify as employers. *Akers v. Alvey*, 338 F.3d 491, 500 (6th Cir. 2003) (citing *Wathen v. Gen. Elec. Co.*, 115 F.3d 400 (6th Cir. 1997)); *Wathen*, 115 F.3d at 405 ("[A]n individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII."); *see also id.* at 406 (". . . Congress did not intend individuals to face liability under the definition of 'employer' it selected for Title VII.").

Hubbard alleges that Watts was his supervisor and states no additional basis under which Watts would qualify as his "employer" within the definition of Title VII. (*See generally* Doc.

22.) Accordingly, consistent with the Sixth Circuit's precedent, Hubbard's Title VII claims against Watts will be **DISMISSED**.  *See Akers*, 338 F.3d at 500; *Wathen*, 115 F.3d at 405.

### B. Title VII Claims for Sexual-Orientation Discrimination

Defendants move to dismiss Hubbard's Title VII claim of sexual-orientation discrimination, asserting that Title VII does not prohibit discrimination on the basis of sexual orientation. Hubbard responds that the Court should delay resolving this claim because the Supreme Court of the United States has granted *certiorari* in *Altitude Express v. Zarda*, 883 F.3d 100 (2d Cir. 2018), to resolve the circuit split on whether Title VII prohibits discrimination based on sexual orientation. Because the merits of Defendants' argument will likely turn on the Supreme Court's anticipated decision, the Court will **RESERVE RULING** on Defendants' motion to dismiss Hubbard's Title VII claims of sexual-orientation discrimination against Metro PCS and Evolution Wireless, pending the Supreme Court's decision in *Altitude Express*.

### C. Claims for Retaliatory Discharge Under the TPPA and Tennessee Common Law, Discrimination Under the THRA, Intentional and Negligent Infliction of Emotional Distress, Defamation, and Negligent Hiring and Supervision

Defendants move to dismiss the following claims, asserting that the applicable statutes of limitation have run: retaliatory discharge under the TPPA and/or Tennessee common law; discrimination in violation of the THRA; negligent or intentional infliction of emotional distress; defamation; and negligent hiring and supervision. Hubbard does not dispute that each of these causes of action would generally be barred by the applicable one-year statutes of limitation and that Hubbard's EEOC charge did not toll the statutes of limitation. (Doc. 31, at 2.) However, Hubbard argues that the claims did not accrue under Tennessee's "discovery rule" when Hubbard was terminated, because Defendants are guilty of "specific acts of fraudulent concealment of the reason for termination and the manufacturing of evidence." (*Id.*)

8

Specifically, he asserts that Defendants offered four different reasons for terminating him, preventing him from "discover[ing] the real reason for his termination." (*Id.* at 4.) He does not suggest a specific date on which he contends the causes of action accrued. (*See generally id.*)

"Under the current discovery rule, a cause of action accrues . . . not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he [or she] has suffered an injury as a result of wrongful conduct." *Smith v. Tenn. Nat'l Guard*, 551 S.W.3d 702, 710 (Tenn. 2018) (internal citations and quotation marks omitted).

Hubbard's claims are barred by the statutes of limitation because his claims accrued on the date he was terminated—June 2, 2018. (Doc. 22, at 3.) On that date, he had actual knowledge of facts sufficient to put a reasonable person on notice that he suffered an injury as a result of wrongful conduct. *See Smith*, 551 S.W.3d at 710. Indeed, Hubbard attempted to file an EEOC complaint as early as June 27, 2018, alleging that he was discriminated against and wrongfully terminated. (Doc. 22, at 3.) He represents that he still has not discovered all of the facts involved in the decision to terminate him because Defendants gave four different pretextual reasons for terminating him, while hiding their actual, discriminatory reasons. (Doc. 31, at 4.) But the discovery rule does not stand for the proposition that a cause of action accrues only when a plaintiff knows *all* of the facts surrounding alleged wrongdoing. Hubbard's causes of action accrued on June 2, 2018—the date he was terminated—yet he did not file the instant action until November 25, 2019. Hubbard does not dispute that his claims for retaliatory discharge under the TPPA and Tennessee common law, discrimination under the THRA, intentional and negligent infliction of emotional distress, defamation, and negligent hiring and supervision all have one-

9

year statutes of limitation. (*See* Doc. 31, at 4–5.) Accordingly, they are barred by the applicable statutes of limitations and will be **DISMISSED**.

### D. Claims for Intentional Interference with Contract Expectancy

Defendants move to dismiss Hubbard's claims of intentional interference with contract expectancy for failure to state a claim upon which relief can be granted. The amended complaint does not specify which factual allegations relate to this cause of action. (Doc. 22, at 1–2.) With respect to this claim, Hubbard's response to Defendants' motion to dismiss is limited to the following:

> . . . Plaintiff has alleged facts that employees at Evolution have published untrue information about his firing to the EEOC and to the other employees and it caused him to not get the EEOC's support, it has caused him to be terminated and we have alleged he has not been able to get gainful employment and believe the discovery of evidence and an answer to the complaint might shed light on the issue and no one will be harmed otherwise.

(Doc. 31, at 2–3.) Based on the amended complaint and Hubbard's response to Defendants' motion to dismiss, Hubbard appears to assert that Watts, possibly Evolution Wireless itself, and others not listed as defendants in this action, interfered with his continuing employment with Evolution Wireless and/or Plaintiff's expectation of an employment contract with another employer.

Under Tennessee law, to state a claim for intentional interference with contract expectancy, a plaintiff must allege:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means . . . ; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citations, quotation marks, and emphasis omitted). Although the cause of action refers to "contract expectancy," it can include interference with at-will employment relationships. *See, e.g.*, *Lyne v. Price*, No. W2000-00870-COA-R3CV, 2002 WL 1417177, at *1 (Tenn. Ct. App. June 27, 2002).

Hubbard has not stated a claim based on the allegation that Watts or Evolution Wireless interfered with his prospects of being hired elsewhere because he does not allege "an existing business relationship" with any "specific third parties" or a "prospective relationship with an identifiable class of third persons." *See Trau-Med*, 71 S.W.3d at 701. He does not specify any prospective employers to whom he applied and therefore has not satisfied the first element. *See id.* Nor has he satisfied the other elements, since he does not list any "relationship" with which the defendants could have interfered. *See id.* Accordingly, Hubbard has not stated a claim based on any expectancy of a relationship with any prospective employers.

With respect to a potential claim based on interference with Hubbard's employment relationship with Evolution Wireless, Hubbard cannot base a claim on Evolution Wireless's interference with its own employment relationships. *See Trau-Med*, 71 S.W.3d at 701. Thus, he has not stated a claim against Evolution Wireless for interference with contract expectancy.

However, viewing the factual allegations in the amended complaint in the light most favorable to Hubbard, he has sufficiently stated a claim against Watts for tortious interference with contract expectancy. Regarding the first element, a claim for intentional interference with employment "contemplate[s] a three-party relationship—the plaintiff as employee, the corporation as employer, and the defendants as procurers or inducers[.]" *Palmore v. Neal*, No. M2013-02153-COA-R3CV, 2014 WL 2717495, at *5 (Tenn. Ct. App. June 12, 2014) (emphasis omitted). Generally, then, a plaintiff does not state a claim when he alleges that an agent of the

11

employer induced the employer to fire him. *See id.* However, a supervisor may be liable if he acted "to procure [the employee's] discharge to further his own personal interests and for reasons unrelated to furthering the interests of the [employer]." *Lyne*, 2002 WL 1417177, at *1 (reversing dismissal of a complaint on this basis). The amended complaint plausibly alleges that Watts procured Hubbard's dismissal for his own purposes, including so that he could be rid of Hubbard's complaints about his personal relationships with subordinate employees. (*See* Doc. 22, at 8.)

With respect to the second element, Watts—as Hubbard's supervisor—clearly knew of Hubbard's employment with Evolution Wireless. *See Trau-Med*, 71 S.W.3d at 701. As for the third element, Hubbard alleges that Watts personally made the decision to terminate him and, therefore, intended to cause his discharge. *See id.* Fourth, using false pretenses to terminate Hubbard would constitute "improper means," while doing so to get rid of him for personal reasons would evince an "improper motive." *See id.* Finally, Hubbard has sufficiently pled the fifth element, that he was injured as a result of his termination from Evolution Wireless. *See id.* Therefore, Hubbard has stated a claim against Watts for intentional interference with contract expectancy.

IV. **CONCLUSION**

For the reasons explained above, the Court **GRANTS IN PART, DENIES IN PART,** and **RESERVES RULING IN PART** on Defendants' partial motion to dismiss (Doc. 11). Defendants' motion is **GRANTED** with respect to the following claims, which are hereby **DISMISSED WITH PREJUDICE**: (1) the Title VII claims against Watts; (2) the retaliatory-discharge claims under the TPPA against all Defendants; (3) the retaliatory-discharge claims under Tennessee common law against all Defendants; (4) the THRA claims against all

Defendants; (5) the intentional- and negligent-infliction-of-emotional-distress claims under Tennessee common law against all Defendants; (6) the defamation claims against all Defendants; (7) the negligent-hiring and negligent-supervision claims under Tennessee common law against all Defendants; and (8) the intentional-interference-with-contract-expectancy claims under Tennessee common law against Evolution Wireless and Metro PCS.  The Court **RESERVES RULING** on Defendants' motion to dismiss the Title VII claim based on sexual-orientation discrimination.  Defendants' motion is **DENIED** with respect to the claim of intentional interference with contract expectancy against Watts.  That claim and the Title VII claims of sex discrimination and retaliation against Metro PCS and Evolution Wireless will proceed.

    **SO ORDERED.**

                                            **/s/** *Travis R. McDonough*
                                            **TRAVIS R. MCDONOUGH**
                                            **UNITED STATES DISTRICT JUDGE**